

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 23, 2024

**BY ECF**
The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>**United States v. Joseph Sanders**</u>**, 22 Cr. 697 (KPF)**

Dear Judge Failla:

      The Government respectfully submits this letter in advance of sentencing in this matter for defendant Joseph Sanders (the "defendant"), which is scheduled for May 2, 2024.  On December 15, 2023, the defendant pled guilty to a twelve-count information (the "Information") charging him with eleven counts of Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2, and one count of possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). Over the course of 2022, the defendant terrorized the Bronx, Queens, and Brooklyn—orchestrating eleven armed robberies that, at times, turned violent.  Because of the seriousness of the offense and the defendant's troubling criminal history, which shows that he has not been deterred by substantial prison sentences, this Court should impose a sentence of 135 months' imprisonment, at the top of the stipulated Guidelines range.

    **A.  Overview**

        i.  <u>The Offense Conduct</u>

      In the spring and fall of 2022, the defendant committed 11 armed robberies throughout New York City.  Between March and April 2022, the defendant committed four armed robberies of bodegas and smoke shops located in Queens, Bronx, and Brooklyn.  (PSR ¶¶ 21-24).  Wearing a mask, the defendant would enter the businesses, brandishing a silver gun and demanding money.  (PSR ¶¶ 21-24).  At times, he would point the gun directly at the terrified cashier.  (PSR ¶ 22). For three of the robberies, the defendant was accompanied by co-conspirators.  (PSR ¶¶ 21-24). But in all cases, it was the defendant carrying the firearm.  (PSR ¶¶ 21-24).

      In November 2022, the defendant continued his robbery spree.  Between November and December 2022, the defendant committed seven armed robberies of a tax preparation business, bodegas, and smoke shops located in the Bronx and Brooklyn.  (PSR ¶¶ 25-38).  The defendant would enter the businesses brandishing a firearm and demanding money.  (PSR ¶¶ 25-38).  For example, during the robbery of the tax preparation business, the defendant kicked open a door,

holding a firearm in his hand. He then grabbed the sole employee by the arm and led her to a back room. After the victim told the defendant that the tax preparation business had no cash on hand, the defendant took her phone and $200 from her wallet. (PSR ¶¶ 25-31). A video from that robbery can be found on page one of Exhibit 1 to this submission.

On two occasions, the defendant violently pistol whipped the cashiers, before withdrawing thousands of dollars from the cash registers. (PSR ¶¶ 32, 34). Videos from those robberies, which occurred on November 5, 2022, and November 14, 2022, can be seen at pages two and three of Exhibit 1, respectively.

Even when not assaulting the victims with a firearm, the defendant acted to inflict maximum terror, pointing his firearm directly at the victims. One such example is below, from the November 26, 2022, robbery of a deli:



In total, the defendant stole $22,374. (PSR ¶¶ 40). He also caused property damage, including causing damage to the tax preparation business's door and ceiling.

At the time of the defendant's arrest, a .40 caliber Iberia pistol was found in his apartment. (PSR ¶¶ 39). The pistol was loaded.

ii. Procedural History

The defendant was arrested on December 6, 2022, and detained. On December 15, 2023, pursuant to a plea agreement (the "Plea Agreement"), the defendant pled guilty to a twelve-count Information charging him with eleven counts of Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2, and one count of possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).

In the Plea Agreement, dated September 13, 2023, the parties stipulated to a United States Sentencing Guidelines (the "Guidelines") range of 108 to 135 months' imprisonment (the "Guidelines Range"), based on an Offense Level of 30 and Criminal History Category of II. (PSR ¶ 17). The United States Probation Office agrees with this calculation. (PSR ¶¶ 131, 139, 191).

### B. Discussion

#### i. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596.

After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

#### ii. The Court Should Impose a Sentence At the Top the Guidelines Range of 135 months

A sentence of 135 months' imprisonment—at the top of the Guidelines Range—is warranted in this case, particularly to reflect the nature and seriousness of the offense, ensure deterrence, and protect the public.

The defendant's crimes were extremely serious. Throughout 2022, he terrorized much of New York City, committing 11 armed robberies of bodegas, smoke shops, and even a tax preparation business. No borough was safe. The defendant robbed businesses in Queens, the Bronx, and Brooklyn. He wore masks and disguises, including a wig, in order to conceal his identity. In each case, the defendant would walk into the business with a firearm in hand. He would then demand money, proceeding to take whatever cash he could get his hands on. During one robbery, he took $10,000 from the cash register. (PSR ¶ 38).

The defendant's use of violence and firearms was core to the robberies. When he could not easily enter an establishment, he would forcefully do so, as he did in kicking the door open of the tax preparation business. He would then assault the victims—employees who were just trying to do their jobs. On two occasions, he pistol whipped the victims—who were fortunate not to have been seriously injured—before proceeding to steal thousands of dollars in total from the cash registers. In all cases, the defendant acted to inflict maximum terror. He would, for example, point his firearm directly at the victims' heads, threatening their lives. The Government spoke with a number of the victims. None were willing to put in a statement—as the Court can imagine, reliving trauma can be extremely difficult. But a number noted the terror they experienced at the hands of the defendant. One victim told the Government that, given the trauma he experienced, he sold his ownership stake in the store that was robbed. Another victim, who was hit in the head by the defendant's firearm, said that he continues to be traumatized and has difficulty working at night.

The defendant could have easily killed someone during the robberies. The firearm recovered from the defendant's apartment at the time of his arrest was loaded. And it was a different firearm than what was used during the robberies. This suggests that the defendant had a stash of firearms, and ready access to firearms (despite being prohibited from owning them as a felon).

It also appears that the defendant played a leadership role in these robberies. In at least three of the robberies, the defendant had accomplices. Throughout, the defendant was the one brandishing a firearm. And even when the accomplices were no longer joining the defendant, he continued at it, further suggesting that the defendant was the driving force behind the robberies.

The defendant points to the impact of the pandemic and his lack of employment as causing him to turn to crime. But that is, of course, no excuse. This was not a one-off robbery—the defendant committed 11 armed robberies over the course of four months. He could have realized what he was doing was wrong and stopped. But he did not. Indeed, the defendant continued to rob stores up until just days before his arrest; had he not been arrested, he would have undoubtedly continued his spree. Moreover, the defendant's employment history has shown that he can obtain a job—if and when he wants to. For example, between November 2021 and January 2022, the defendant made $900 per week from working for Instacart. (PSR ¶ 176). There is no indication that he was, for example, terminated or banned from Instacart. But even if he had been, the defendant did not have to turn to crime—he did not have to hurt people, to terrorize the City repeatedly over the course of months. But he did. And that in and of itself calls for a sentence within the Guidelines Range.

A sentence at the top of the Guidelines range of 135 months' imprisonment is appropriate given not only the seriousness of the crime—the danger that the defendant posed each time he committed an armed robbery of his victims—but also because of the defendant's criminal history. That history shows the defendant has not been deterred from committing violent crime, despite having previously served substantial time in prison. The defendant is 46 years old. At 18, he committed a violent robbery—grabbing a woman, threatening her with a four-inch knife out, and demanding money. (PSR ¶ 135). He was sentenced to 10 to 20 years' imprisonment, ultimately serving 17 years after being convicted of additional offenses while in prison, including possessing

dangerous contraband and falsely reporting an offense or incident to law enforcement officers. (PSR ¶ 135-37). But despite spending the vast majority of his adult life in prison and now being well into his 40s, the defendant has not been deterred from a life of crime; he has not turned his life around or aged out of crime. In fact, he has doubled down and become more violent—graduating from knives to firearms and orchestrating 11 armed robberies.

Unlike so many defendants that turn to a life of crime, the defendant grew up in a stable, middleclass home. (PSR ¶ 176). Although his parents were separated, the defendant's father was present during his childhood. He was not abused. By the defendant's own admission, his childhood was "great." (PSR ¶ 176). Indeed, the defendant's brothers and sisters appear to have thrived in this environment—one brother, for example, is a minister, another sibling works for Amazon. (PSR ¶ 145). The defendant could have chosen a different path, but he did not. Life circumstances appears not to have been what hardened the defendant into becoming a violent criminal. Instead, his turn to crime appears to have come from something more innate.

A top of the Guidelines sentence of 135 months' imprisonment then is necessary not only to reflect the seriousness of the offense, but to send a message to the defendant that there will be serious consequences to his actions and to ensure he does not yet again commit another armed robbery.

### C. Conclusion

For the reasons set forth above, a sentence of 135 months' imprisonment is appropriate.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: /s/
Adam Sowlati
Assistant United States Attorneys
(212) 637-2438

cc: Defense Counsel (by ECF)